845 P.2d 1107

**Jimmie D. DIXON and Carolyn B. Dixon, husband and wife, Plaintiffs–Appellants,**

v.

**CITY OF PHOENIX, a municipal corporation; and Aztec Construction Company, a corporation, Defendants–Appellees.**

**No. 1 CA–CV 90–245.**

Court of Appeals of Arizona, Division 1, Department C.

June 16, 1992.

Reconsideration Denied Sept. 2, 1992.

Review Denied March 2, 1993.

Meyer, Vucichevich & Cimala by Henry G. Hester, Phoenix, for plaintiffs-appellants.

Roderick G. McDougall, City Atty. by Kent T. Reinhold, Asst. City Atty., Phoenix, for defendant-appellee City of Phoenix.

Robbins & Green, P.A. by Philip G. May, Phoenix, for defendant-appellee Aztec.

## OPINION

LANKFORD, Judge.

This is an appeal from a judgment entered by the superior court in two consolidated cases involving the condemnation by the City of Phoenix (the "City") of a permanent easement for the construction and maintenance of a water pipeline across a portion of property belonging to Jimmie and Carolyn Dixon ("the Dixons"). The issue on appeal is whether the trial court properly excluded from the final judgment damages for the destruction of vegetation on the Dixons' property both within and outside the easement area that occurred during the construction of the pipeline.

I.

On December 10, 1986, the Phoenix City Council passed an ordinance authorizing the City Manager, the City Attorney, the Real Estate Administrator, and the Finance Director to acquire permanent easements across certain property, including the Dixons' property, to be used as a right-of-way for a waterline. The legal description for the easements attached to the ordinance contained the following language:

> No structure of any kind shall be constructed or placed within this easement except water lines and appurtenances, wooden, wire or removable section-type fencings and/or paving, nor shall any vegetation be planted therein except grass. The City of Phoenix shall not be required to repair or replace any obstruction, paving or vegetation that becomes damaged or must be removed during the course of required construction, reconstruction or maintenance.

An eminent domain action was filed by the City against the Dixons on February 4, 1987. A hearing on the City's application for possession was scheduled for March 6, 1987. Before the hearing took place, the City and the Dixons entered into a right of entry agreement. The agreement allowed the City to enter the Dixons' property without a court order, and the hearing on the application for possession was vacated.

The Dixons stipulated in the agreement that the waterline was a necessary and public use. The agreement also stated that it was not intended as a waiver of the

Dixons' right to just compensation, that the City would negotiate with the Dixons with respect to the just compensation damages, and that if no satisfactory agreement could be reached, the City would institute eminent domain proceedings to determine just compensation.

The right of entry agreement also contained the city's promise not to damage existing vegetation. An addendum to the agreement provided in part as follows:

> The City and its contractors will not enter or cross any of owner's property in order to perform the work other than the easement area. The City will perform the projects so as not to damage or destroy any of the existing terrain or vegetation on owner's property. The City will perform its work in a manner so as not to damage or destroy any of the existing trees in the easement area.

> \* \* \* \* \* \*

> City will repair at its expense any damage caused to owner's property or the property of others.

The City hired Aztec Construction Company ("Aztec") to construct the waterline. The construction project was commenced in June, 1987, and was accepted by the City with final payment in May, 1988. In constructing the waterline on the Dixons' property, Aztec "bulldozed, ripped out and otherwise destroyed virtually every growing thing including large mesquite and palo verde trees, not only in the easement area but, in places outside the easement areas as well," according to a memo later written by the City's Assistant Chief Counsel to the Deputy City Engineer. Neither Aztec nor the City replaced the vegetation.

The Dixons filed a complaint against the City and Aztec. The complaint alleged that the City had breached the right of entry agreement and that Aztec's and the City's trespass and negligence caused the damage to the vegetation. The Dixons sought the cost to replace the vegetation as the measure of their loss. The superior court granted the Dixons' motion to consolidate their action with the City's pending eminent domain action.

After the commencement of the Dixons' lawsuit against the City, the Phoenix City Council amended the original ordinance authorizing condemnation of the easement. The amendment now authorized the taking of the entire fee title to the portion of the Dixons' property on which the waterline was constructed. The amendment was apparently an attempt to extinguish any liability the City might have had to the Dixons for destruction of the vegetation. The City subsequently filed an amended complaint seeking condemnation of fee title of the relevant portion of the Dixons' property. After conducting discovery, the Dixons, the City and Aztec all filed motions for summary judgment. These motions addressed: (1) the necessity for the City to take fee title to the property on which the waterline was constructed; (2) the enforceability of the promise to repair damage contained in the right of entry agreement; and (3) the method to be used in determining compensation for the damage to the Dixons' vegetation.

The superior court granted summary judgment in favor of Aztec. In addition, the court ruled that it was not necessary that the City take fee title to the Dixons' property, thereby rejecting the city's attempt to condemn the fee interest and relegating the City to an easement interest. The court also determined that the right of entry agreement was not enforceable because it did not create a right to compensation apart from the just compensation rule. It further held that just compensation would be measured by the difference between market value of the parcel before the taking and the market value after the taking.

The parties then stipulated to an agreed statement of facts. They agreed that the value of the easement interest the City sought to condemn was $14,000.00 and that the destruction of the vegetation did not reduce the fair market value of the land on which it was growing.

Based on the stipulated facts and its prior rulings, the court entered judgment granting the City condemnation of a permanent easement, awarding the Dixons the sum of $14,000.00 as just compensation, and denying the Dixons' claim for additional damages. Apparently, no severance damages for diminished value of the remainder of the Dixons' property were awarded. The judgment included an exhibit with the legal description of the easement identical to that originally authorized by the Phoenix City Council, including the prohibition against vegetation other than grass on the easement. The Dixons appealed from this judgment.

## II.

The Dixons claim that the trial court erred in failing to award the cost of restoration damages against the City for the destruction of vegetation that occurred on their property. They argue that such destruction breached the terms of the right of entry agreement and that the remedy was specified in the agreement. *See generally Deuel v. McCollum*, 1 Ariz.App. 188, 400 P.2d 859 (1965) (remedy for breach of contract is governed by terms of contract where contract provides for remedy).

The City answers that the right of entry agreement did not abridge the City's statutory right to obtain the easement through condemnation. The City's obligation to compensate the Dixons for condemnation is limited to just compensation. In determining just compensation in a partial taking, such as that involved in the case at bar, Ariz.Rev.Stat. ("A.R.S.") § 12–1122(A) provides that a court or jury shall assess (1) the market value of the property actually taken by the condemnation, and (2) the diminution in the remaining property's market value caused by the taking.[1] Because the Dixons stipulated that the destruction of the vegetation did not reduce the fair market value of their property, the City contends that the Dixons are entitled to no more than the $14,000.00 awarded, which the parties agreed was the value of the easement interest taken.

■ The right of entry agreement required the City to construct the waterline without destroying the Dixons' vegetation and to repair at its expense any damage caused by the construction.[2] Therefore, the agreement conflicts with the actual easement granted by the court, which included the surface use restrictions and disclaimer quoted above.

■ While we agree that a governmental entity cannot contract away its eminent domain power, *Tucson Electric Power Co. v. Adams*, 134 Ariz. 396, 656 P.2d 1257 (App.1982), the right of entry agreement did not bar the City from taking the easement. The agreement merely provided that the City was to assume certain obligations in exchange for obtaining the right of entry.

1. This court has held that if evidence of market value is unavailable because the property is unique, consideration may be given to the value peculiar to the owner or cost of cure or some other method which would result in fairly compensating the landowner for a taking. *State ex rel. Herman v. Southern Pac. Co.*, 8 Ariz.App. 238, 445 P.2d 186 (1968). However, in this case, the Dixons never argued that the character of their property was so unique as to absolutely preclude any ascertainment of the market value. *See Pima County v. Palos Companies Unlimited*, 140 Ariz. 481, 682 P.2d 1148 (App.1984) (method of compensation used in *Southern Pacific* case is applicable only if evidence of market value is unavailable).

2. The City claims in its brief that the language contained in the addendum to the right of entry agreement regarding the vegetation was merely intended to alert the City and Aztec employees that construction was to result in as little vegetation damage as possible, not to change the easement rights that the City was condemning. Interpretation of a contract is a question of law for the court and, where language in a contract is clear and unambiguous, it must be given effect as written. *Hadley v. Southwest Properties Inc.*, 116 Ariz. 503, 570 P.2d 190 (1977). The language of the addendum clearly provides that the City agrees not to damage or destroy any vegetation on the Dixons' property. The parties manifestly intended something more than a mere "alert."

A governmental entity may not disregard its contractual liabilities simply because they were incurred in connection with a taking of property. *See State ex rel. Herman v. Schaffer*, 105 Ariz. 478, 467 P.2d 66 (1970); *State ex rel. Herman v. Tucson Title Ins. Co.*, 101 Ariz. 415, 420 P.2d 286 (1966). In *Schaffer*, some property owners conveyed portions of their property to the state for use as a right-of-way for a highway. The consideration for this taking included an agreement by the state that it would install and maintain seven crossovers for the benefit of the abutting properties. The state later turned the highway into a limited-access highway and eliminated the crossovers. In the state's subsequent action for declaratory relief, the property owners argued that the limitation of their access through the elimination of the crossovers was a compensable taking and also was a breach of their agreement with the state. The supreme court held that the limitation of access that occurred when the crossovers were eliminated was not a compensable taking because the state provided a frontage road for the benefit of the property owners. However, the court also stated that, because the state breached its express agreement with the owners to maintain the crossovers, it was liable in damages to the owners of abutting land. The court explained as follows:

> However, a contractual element is injected into this case. * * * Assuredly, the police power does not give the State authority to make and breach contracts with impunity. If the State considers it advantageous to agree to construct and maintain crossovers at the time of taking land as part of the consideration rather than pay the full and just compensation in money, it should not subsequently complain that it is being held to this agreement or to responding in damages for the breach thereof.

105 Ariz. at 486, 467 P.2d at 74.

In *Schaffer*, then, the supreme court held that the property owners could recover damages for breach of the state's agreement to provide the crossovers even though the elimination of the crossovers itself was not a compensable taking under eminent domain principles.

Another case supports the right of a property owner to recover damages for the breach of a contract made by a governmental entity in connection with a condemnation. In *State ex rel. Herman v. Tucson Title Ins. Co.*, 101 Ariz. 415, 420 P.2d 286 (1966), the state made promises to a property owner, a portion of whose land the state was condemning for the construction of a highway, that an interchange would be built as shown on drawings presented to the property owner. In consideration for these promises, the property owner settled with the state and deeded the desired property to the state. The state subsequently changed its plans and eliminated the promised interchange. When the state later filed a condemnation complaint to condemn a portion of the property owner's land, the property owner asked that damages be assessed for the state's failure to construct the interchange. The supreme court held that the state was required to respond in damages for the breach of its promise to construct the interchange. 101 Ariz. at 417, 420 P.2d at 288.

The case at hand differs somewhat from *Schaffer* and *Tucson Title*. In this case, the City's promises contained in the right of entry agreement were not part of the consideration for the taking of the easement, but were given in exchange for an immediate right to enter the land. The right of entry agreement contemplated that just compensation would be paid for the easement at a later time.

Nevertheless, the fact that the City's promises were exchanged for a right of entry rather than for the easement itself does not render the agreement less binding. The Dixons gave valuable consideration for the city's promises. They permitted the City to enter their land and begin the project without a possession hearing or

a bond. They also stipulated to the necessity and public use of the waterline. If the City considered it advantageous to make promises to obtain concessions from the Dixons, it should not subsequently complain that it is required to respond in damages for its breach of those promises.

Therefore, the trial court erred in holding that the Dixons were limited to "just compensation" and incurred no damages recoverable under the right of entry agreement. The next question is which measure of contract damages should be applied: diminished market value or cost of restoration?

The Dixons argue that the proper measure of damages is the cost to restore all of the destroyed vegetation because the agreement itself provides that the City will repair any damage caused to the Dixons' property. The City responds that, notwithstanding the right of entry agreement, the action is still one in eminent domain. Consequently, the damages for breach of the agreement should be determined in accordance with A.R.S. § 12–1122: the Dixons are entitled only to the market value of the easement interest taken plus severance damages, i.e., the difference between the fair market value of the remaining property before and after the taking. *See State ex rel. Miller v. Filler*, 168 Ariz. 147, 812 P.2d 620 (1991). However, no measurable severance damages arose here because the loss of vegetation did not affect the market value of the remaining property. Thus, if the City is correct, then the Dixons are entitled only to the $14,000.00 they received for the taking of the easement interest and are not entitled to any damages for breach of the agreement.

■ The City relies on *Schaffer* and *Tucson Title* in support of its argument that the "before and after" rule rather than costs to repair should be used to determine the Dixons' damages. We recognize that

the "before and after" measure of damages was used in *Schaffer* and *Tucson Title* and that the court treated both actions as in eminent domain. Nevertheless, the landowners were entitled to recover damages due to the state's breach of its contracts that they could not otherwise recover as "just compensation" under eminent domain principles. That is, the "before and after" rule encompassed the adverse effect on market value of the state's breach of contract. Similarly, the Dixons may recover damages caused by the City's breach of the right of entry agreement. They may do so even though they would be unable to recover for the destruction of the vegetation as an item of damage in eminent domain. The difference between this case and *Schaffer* and *Tucson Title* is two-fold: first, the agreement involved here prescribes the applicable measure of damages; second, the "before and after" rule is a wholly inadequate method of compensation.

■ The measure of the Dixons' damages is contained in the right of entry agreement. A contract provision governing remedies or damages is generally binding on the parties. *Roy H. Long Realty Co., Inc. v. Vanderkolk*, 26 Ariz.App. 226, 228, 547 P.2d 497, 499 (1976). The right of entry agreement provides that the City will repair at its expense any damage caused by the construction of the waterline. Because the cost of repair was the agreed-upon measure of damages, this is what the Dixons may recover.[3]

■ The City argues that, notwithstanding the right of entry agreement, the Dixons should not be able to recover restoration costs as damages because such an award would result in economic waste. The City relies on contract cases involving construction of buildings for the principle that the general cost of repair measure of damages is inapplicable if economic waste

---

**3.** This does not mean that the Dixons may replant the easement area contrary to the easement's surface use restrictions, which allow only grass. Therefore, the Dixons cannot insist that the City actually replace the destroyed vege-

tation within the easement. However, the Dixons are entitled to recover the amount of money which represents the reasonable costs of restoring the vegetation because that was the agreed amount of compensation.

would result from repairing and completing the construction in accordance with the contract. *See, e.g., County of Maricopa v. Walsh & Oberg Architects, Inc.*, 16 Ariz. App. 439, 494 P.2d 44 (1972); *Blecick v. School District No. 18 of Cochise County*, 2 Ariz.App. 115, 406 P.2d 750 (1965), *rev'd on other grounds*, 139 Ariz. 184, 677 P.2d 1292 (1984). In that event, the proper measure of damages would be the difference in the value of the building had it been completed in accordance with the contract and the value of the building as erected, rather than the cost to repair. *Id. See also* RESTATEMENT (SECOND) OF CONTRACTS § 348 (1981). The City argues that it would be economic waste to award the Dixons' the claimed repair cost of over $200,000 because it is so much greater than the diminution in value of their property, which is zero.

The economic waste exception does not vitiate the general rule in the circumstances at hand. The comments to the RESTATEMENT explain that economic waste that occurs when remedying the construction defects would largely consist of undoing work already (although improperly) performed. RESTATEMENT § 348, comment c. In contrast, the restoration of the Dixons' vegetation would not entail tearing down a partially completed building or undoing extensive construction work to correct a minor defect.

▋ Using the diminished value standard to measure the Dixons' damages would also effectively deny them any compensation for the City's breach of its contract because the parties agree that the market value of the Dixons' property is unaffected. Yet it is clear that the Dixons suffered harm as a result of the breach. There can be no hesitation in choosing between a measure of damages that is wholly ineffectual and a measure of damages which offers some compensation and upon which the parties specifically agreed. The Dixons

are entitled to damages based on the cost of restoration. Stated another way, should the City be allowed to breach its contract without being required to pay any damages when a loss clearly resulted from the breach? We think not.

### III.

The Dixons also claim that they are entitled to damages for trespass and negligence. They contend the City's destruction of the vegetation was not a necessary incident of the construction of the waterline. The Dixons argue that injury to property not necessary to the construction and operation of a public service for which an easement is taken gives rise to a cause of action separate from the eminent domain proceeding. *See, e.g., Grainland Farms, Inc. v. Arkansas Louisiana Gas Company*, 11 Kan.App.2d 402, 722 P.2d 1125 (1986); *Wehrum v. Village of Lincolnwood*, 91 Ill.App.2d 418, 235 N.E.2d 343 (1968). *See also* 6A J. SACKMAN, NICHOLS, THE LAW OF EMINENT DOMAIN § 28.31, at 28–93 (rev. 3d ed. 1990). The cases generally hold that an easement obtained by a governmental entity for a public use is only as broad as necessary for the accomplishment of the public purpose for which the easement was obtained and, to the extent the easement holder exceeds this right, it will be regarded as a trespasser and is responsible for damages. *E.g., Ostrem v. Alyeska Pipeline Service Co.*, 648 P.2d 986 (Alaska 1982).

The City does not dispute that it is liable to the Dixons if it negligently constructed the waterline and damaged the property. However, the City asserts that where possible the property owner must recover the damages in the eminent domain proceedings and not through a separate tort action, and that the measure of damages must be determined according to the "before and after" rule.[4]

▋ Other jurisdictions have rejected the city's argument that condemnation pro-

4. The City relies upon *State v. Dart*, 23 Ariz. 145, 202 P. 237 (1921), *rev'd on other grounds*, 93 Ariz. 384, 381 P.2d 107 (1963) and *City of Tuc-* *son v. Gastelum*, 25 Ariz.App. 127, 541 P.2d 590 (1975). We do not believe that *Dart* and *Gastelum* stand for the proposition that a landowner

ceedings necessarily include damages from a prior trespass. They hold that a condemnation award does not preclude an independent suit in tort. *See generally* Annot., 33 A.L.R.3d 1132 (1970). Most courts have decided that the "condemnation proceeding is limited to compensating the landowner for the taking and does not include damages which are not directly related to a diminution in the fair market value of the property such as may result from a tortious trespass." *Grainland Farms,* 722 P.2d at 1127. Although the alleged torts by the City of Phoenix occurred *after* the condemnation proceedings had been commenced, the Dixons are nevertheless entitled to recover in tort because the damages they seek are not compensable in the condemnation.

The City argues that diminution in value limits the Dixons' recovery. It cites cases in which the courts have allowed cost of restoration for injury to buildings, fences or other improvements only if such cost does not exceed the diminution in market value of the land. *See Mikol v. Vlahopoulos,* 86 Ariz. 93, 340 P.2d 1000 (1959); *Blanton & Co. v. Transamerica Title Ins.*

*Co.,* 24 Ariz.App. 185, 536 P.2d 1077 (1975).[5] The City concludes that the Dixons were entitled to no more than the award they received because the cost to replace the vegetation exceeds the loss in market value attributable to the destruction, which is zero.

While we agree that the usual measure of damages for wrongful destruction of trees and shrubbery is the difference between the value of the land immediately before and immediately after the injury, well-reasoned authority recognizes an exception to this rule based on the intrinsic value of the landscaping.[6] "The cardinal rule of the law of damages is that the injured party shall be fully compensated." *Denoyer v. Lamb,* 22 Ohio App.3d 136, 490 N.E.2d 615, 619 (1984). Rules developed for measuring damage should be "flexible guides in determining the true amount of loss." *Thatcher v. Lane Construction Co.,* 21 Ohio App.2d 41, 254 N.E.2d 703, 706 (1970). The courts "have placed a greater emphasis on the rights of a property owner to enjoy the aesthetic value of trees and shrubbery, notwithstanding the fact they

---

cannot recover tort damages greater than the "before and after" measure of damages allows. Rather, in those cases the condemnors attempted to prevent the landowners from including in the eminent domain proceedings damages arising from improper construction, and the courts merely pointed out that "the condemnor should not be allowed to assert its own wrong." *State v. Dart,* 23 Ariz. at 151, 202 P. at 239 (quoting treatise). Nor do we believe that such *separate* tort damages are prohibited by A.R.S. § 12–1122. That statute provided as follows:

§ 12–1122. Ascertainment and assessment of value, damages and benefits.

A. The court or jury shall ascertain and assess:

1. The value of the property sought to be condemned and all improvements thereon pertaining to the realty, and of each and every separate estate or interest therein separately.

2. If the property sought to be condemned constitutes only a part of a larger parcel, the damages which will accrue to the portion not sought to be condemned by reason of its severance from the portion sought to be condemned, *and the construction of the improvement in the manner proposed by the plaintiff.*

\*　　\*　　\*　　\*　　\*　　\*

(Emphasis added.)

**5.** *Mikol* is distinguishable from the case at hand. First, in *Mikol,* the court assumed, and neither party apparently disputed, that the destroyed vegetation could not be replaced. In addition, it was the defendants rather than the plaintiffs who were claiming that the cost of restoration was the proper measure of damages because it was the lesser amount. Therefore, the plaintiffs never argued that cost of restoration damages would be appropriate even if such cost exceeded the diminution in market value of the land.

**6.** *See, e.g., Heninger v. Dunn,* 101 Cal.App.3d 858, 162 Cal.Rptr. 104 (1980); *Rector, etc. v. C.S. McCrossan, Inc.,* 306 Minn. 143, 235 N.W.2d 609 (Minn.1975); *American Savings & Loan Ass'n v. Pierce,* 28 Utah 2d 76, 498 P.2d 648 (1972); *Thatcher v. Lane Const. Co.,* 21 Ohio App.2d 41, 254 N.E.2d 703 (1970); *Gross v. Jackson Township,* 328 Pa.Super. 226, 476 A.2d 974 (1984). *See generally* Annot., 95 A.L.R.3d 508, §§ 4, 5 (1979) and cases cited therein.

may have little commercial value or that their destruction may, indeed, even enhance the market value of the property." *Rector, Etc. v. C.S. McCrossan*, 235 N.W.2d at 610.

The RESTATEMENT (SECOND) OF TORTS § 929 (1979) also supports a cost of restoration measure of damages. Arizona courts generally follow the RESTATEMENT in the absence of controlling Arizona authority. *E.g., Jesik v. Maricopa County Comm. Coll. Dist.*, 125 Ariz. 543, 611 P.2d 547 (1980). Section 929 states as follows:

### Harm to Land from Past Invasions

(1) If one is entitled to a judgment for harm to land resulting from a past invasion and not amounting to a total destruction of value, the damages include compensation for

(a) the difference between the value of the land before the harm and the value after the harm, *or at his election in an appropriate case, the cost of restoration that has been or may be reasonably incurred,*

(b) the loss of use of the land, and

(c) discomfort and annoyance to him as an occupant.

(2) If a thing attached to the land but severable from it is damaged, he may at his election recover the loss in value to the thing instead of the damage to the land as a whole.

(Emphasis added.)

The comment to RESTATEMENT § 929 provides that although damages are generally limited to the market value measure when restoration costs are disproportionate, this is not so when the owner has a reason for restoring the property to its original condition. The comment gives the following example:

[I]f a building such as a homestead is used for a purpose personal to the owner, the damages ordinarily include an amount for repairs, even though this might be greater than the entire value of the building. So, when a garden has been maintained in a City in connection with a dwelling house, the owner is entitled to recover the expense of putting the garden in its original condition even though the market value of the premises has not been decreased by the defendant's invasion.

RESTATEMENT § 929, comment b.

In the instant case, the evidence reveals that the Dixons' land was purchased with the intent that it be a homesite and that the vegetation on the land had intrinsic value to the owners for aesthetic reasons. In a number of jurisdictions, these factors have led courts to permit the landowner to recover the cost of restoring the land.

In *Thatcher*, the trial court found the wooded nature of the homesite and privacy and aesthetic considerations were the plaintiff's primary reasons for purchasing the lot. Thus, the court of appeals held that "[w]here the presence of trees is essential to the planned use of property for a homesite ..., where not unreasonable, and where such trees are destroyed by trespassers, the owner may be awarded ... the fair cost of restoring his land to a reasonable approximation of its former condition...." 254 N.E.2d at 708.

Similarly, in *Rector, Etc. v. C.S. McCrossan*, 235 N.W.2d at 610, the court held that where a grove of trees "gave the area a natural, pleasing, aesthetic, wooded atmosphere," and also protected and screened the property from the sight and sound of traffic, "replacement cost was a proper element of damages ... notwithstanding plaintiff's inability to prove that the destruction of the trees diminished the value of the property as a whole."

Finally, in *Denoyer v. Lamb*, 490 N.E.2d at 618, the defendants cut and damaged trees in a wooded area at the rear of four homesites, but the plaintiffs offered no evidence of lost market value. The court held that "when the owner intends to use the property for a residence or for recreation ... the owner is not limited to the diminu-

tion in value ... or other commercial value of the timber. He may recover ... the costs of reasonable restoration of his property to its preexisting condition or to a condition as close as reasonably feasible, without requiring disproportionate expenditures ..." *Id.* at 618.

The availability of damages based on restoration costs does not open the door to damage awards exaggerated by the impracticability of repairs. Those courts invoking the intrinsic value exception have generally stressed that only *reasonable* costs of replacing destroyed vegetation may be recovered. *See, e.g., Rector, etc. v. C.S. McCrossan*, 235 N.W.2d at 611 (replacement costs may be considered to extent cost is "reasonable and practicable"); *Thatcher v. Lane Construction Co.*, 254 N.E.2d at 708 (owner entitled to "the fair cost of restoring his land to a reasonable approximation of its former condition, if such restoration be practical").

■ We hold that, in appropriate cases, a landowner whose vegetation has been destroyed by a trespass may receive damages based on restoration costs. This is so even when the amount may exceed the diminution in market value of the real property on which the vegetation grew. If the City did commit a trespass, and the vegetation had intrinsic value to the landowner, and restoration can be achieved at a cost not unreasonable in relation to the damage inflicted, then the Dixons are entitled to damages based on restoration costs.

The trial court has not yet determined whether the City was negligent or had trespassed because the only disputed issues below were whether the measure of damages allowed any recovery and whether the condemnation was necessary. However, given the City's promises not to destroy vegetation, some evidence exists that the removal of the Dixons' vegetation was not a necessary incident of the construction of the waterline and therefore constituted a trespass. Evidence also exists in the negotiated terms of the right of entry agreement prohibiting destruction of the vegetation that the Dixons had personal reasons for restoring their land to its original condition. Deposition testimony of the City's real estate agent who negotiated with the Dixons states that Jimmie Dixon had expressed concern about the vegetation and had stated to the agent that it was a "beautiful area and he did not want it destroyed by equipment on the line being installed." Jimmie Dixon's deposition reveals that he planned to build a home on the property, and that, after entering into the right of entry agreement, he personally trimmed all the trees along the right-of-way in order to make it easier for the workers to perform the construction without destroying the vegetation.

The trial court therefore erred in limiting the Dixons to the "before and after" measure of damages, which effectively barred them from any recovery for the destruction of the vegetation. Thus, in addition to being entitled to reasonable cost of restoration damages from the City for its breach of the right of entry agreement, the Dixons may be entitled to such damages for the City's trespass.

## IV.

The Dixons' claim against Aztec Construction was for trespass and negligence. The sole basis for Aztec's motion for summary judgment was Jimmie Dixon's admission that the destruction of the vegetation did not reduce the fair market value of the Dixons' property. The trial court granted summary judgment in favor of Aztec on the ground that the Dixons could not prove any damages.

Aztec defends the summary judgment in its favor on the same ground, arguing that the only allowable measure of damages is the difference in market value immediately before and immediately after the injury, which is zero in this case.

For the reasons stated above, we believe that damages may also be based on cost of restoration. We therefore reverse the

judgment in favor of both Aztec and the city, and remand the case to the superior court for further proceedings.

McGREGOR, J., concurs.

GRANT, Judge, dissenting.

I respectfully dissent. I would affirm the judgment of the trial court.

The case at bar differs from the *Schaffer* and *Tucson Title* cases in that the City's promises contained in the right of entry agreement were not the consideration for the taking of the easement. The right of entry agreement contemplates that just compensation would be paid for the easement at a later time, either through escrow or through eminent domain proceedings. Private negotiations evidently failed because the eminent domain proceedings were pursued. In those proceedings, the Dixons stipulated that the value of the easement interest taken was $14,000.00 and judgment was entered in their favor for that amount. In executing the right of entry agreement, the City did not forfeit the right it was acquiring in the condemnation to remove from the easement area all vegetation except grass. Damage outside of the easement area was beyond the purview of the condemnation but was still part of the project for assessing compensation.

The Dixons assert, and the majority agrees, that the proper measure of damages for the City's breach of the right of entry agreement should be the cost to restore all of the destroyed vegetation because the agreement provides that the City will repair at its expense any damage caused to the Dixons' property. The City does not dispute that it is responsible for all damages associated with the waterline project and that the Dixons are entitled to receive just compensation for the taking and all construction damage. However, the City argues that, notwithstanding the fact that there is a contractual element in this case by virtue of the right of entry agreement, the action is still one in eminent domain and the damages for breach of the

agreement should be determined in accordance with eminent domain principles. The City therefore asserts that, under the just compensation procedures set forth in A.R.S. § 12–1122, the Dixons were only entitled to the market value of the easement interest taken, as well as severance damages, if any, in the amount of the difference between the fair market value of the remaining property before and after the taking. *See State ex rel. Miller v. Filler*, 168 Ariz. 147, 812 P.2d 620 (1991). Because there were no typical severance damages here since the loss of vegetation did not reduce the market value of the remaining property, I believe the Dixons were only entitled to the $14,000.00 they received for the value of the easement interest. The City claims that the right of entry agreement only resolved immediate possession but did not change the action from one in eminent domain to one in contract. I agree.

The City relies on *State ex rel. Herman v. Schaffer*, 105 Ariz. 478, 467 P.2d 66 (1970), and *State ex rel. Herman v. Tucson Title Ins. Co.*, 101 Ariz. 415, 420 P.2d 286 (1966), in support of its argument that the "before and after" rule rather than costs to repair should be used to determine the Dixons' damages for the City's breach of the right of entry agreement. In *Schaffer*, the facts of which were discussed earlier, the state had argued that the proper measure of damages for its breach of the contract to maintain the crossovers was the value of the landowners' right at the time the property was originally deeded to the state. The court stated that this rule of retroactive damages would "allow the state to speculate in land values to the detriment of the property owners" and held, therefore, that the proper measure of damages was "before and after" damages, with the market value of the land with access by crossovers as the before condition and the market value of the land following the elimination of the "crossovers" as the "after" condition. 105 Ariz. at 486–487, 467 P.2d at 74–75. Similarly, the court in *Tucson Title* held that the measure of dam-

ages for the state's breach of its agreement to construct an interchange in exchange for the taking of some property was the value of the property owner's remaining property, assuming the interchange was constructed, as the "before" situation, less the value of the property without such interchange. 101 Ariz. at 416–17, 420 P.2d at 287–288.

The "before and after" measure of damages was used in the *Schaffer* and *Tucson Title* cases, which, like the case at bar, both involved the breach by a governmental entity of a contractual obligation made to property owners in an eminent domain situation. I would hold that the Dixons are not entitled to recover from the City the reasonable costs of restoring the destroyed vegetation on that portion of their property not located within the easement area since the value of the property remained unchanged.

The right of entry agreement did not limit the City's eminent domain power. The easement rights which the City condemned included surface use restrictions that prohibit all vegetation within the easement area other than grass. Therefore, the destroyed vegetation within the easement area cannot be replaced and the Dixons should not recover the costs of restoring vegetation to that area.